**United States District Court**
**Southern District of Ohio**
**Western Division**

THOMAS A. COVERDALE,

    Plaintiff,

    v.

DAVID C. CONLEY,

    Defendant.

Case No: 1:19-cv-920

McFarland, J.
Bowman, M.J.

### REPORT AND RECOMMENDATION

Plaintiff Thomas Coverdale, through counsel, filed suit under 42 U.S.C. §1983 against Defendant David Conley.  Plaintiff alleges that Defendant deliberately failed to provide adequate medical care at a time when Plaintiff was incarcerated in a state penal institution.   Defendant has filed a motion for summary judgment, which has been fully briefed by both parties.  For the reasons that follow, Defendant's motion for summary judgment should be GRANTED.

### I.     Standard of Review

Summary judgment is  appropriate  "if  the  pleadings,  depositions,  answers  to interrogatories, and admissions on file, together with the affidavits, if any, show that there is  no  genuine  issue  as  to  any  material  fact  and  that  the  moving  party  is  entitled  to  a judgment as a matter of law."  Fed. R. Civ .P. 56(c).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party has the burden  of  showing  an  absence  of  evidence  to  support  the  nonmoving  party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  However, once the nonmoving

party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the nonmoving party's position will be insufficient; the evidence must be sufficient for a jury to reasonable find in favor of the nonmoving party. *Id.* at 252.

Under the foregoing standard, Defendant is entitled to judgment as a matter of law.

## II.     Undisputed Facts[1]

Plaintiff was released under supervision on July 11, 2021, but previously was incarcerated at the Southern Ohio Correctional Facility ("SOCF"). Defendant Conley was a Nurse Practitioner at SOCF during the relevant time period at issue. In this lawsuit, Plaintiff alleges that Defendant exhibited deliberate indifference to Plaintiff's serious medical need on October 30, 2017, when Defendant misdiagnosed Plaintiff's umbilical hernia as "reducible" rather than "irreducible"[2] and delayed transferring Plaintiff to a hospital for surgery until the following day.

Plaintiff's umbilical hernia was a longstanding condition; Plaintiff admits that he had suffered from the condition for at least 6 years. In June 2017, Plaintiff was transferred to SOCF, where he had several interactions with medical staff relating to his hernia as well as for other medical maladies. On August 22, 2017, Defendant examined Plaintiff's hernia. (Doc. 24-4 at 80, PageID 266). At that time, Plaintiff stated that he was able to reduce his hernia but requested a surgical repair. Defendant's notes reflect "Pt was rude,

---

[1]All *reasonable* inferences have been drawn in Plaintiff's favor.
[2]"Hernias are classified as reducible when the hernia contents can be placed intra-abdominally through the layers of the abdominal wall." https://www.ncbi.nlm.nih.gov/books/NBK555972/ (accessed on 10/21/21).

argument[at]ive inconsistent and misleading" and that [s]everal attempts to redirect and asked pt to stop interrupting during HP1." (*Id*.) In his general examination findings, NP Conley described Plaintiff as "in no acute distress, unpleasant." (*Id*.)

Decisions regarding routine referrals for surgical consultation are made through the Collegial Review process under established SOCF policies and protocols, and cannot be made by Nurse Practitioners such as the Defendant in this case. Plaintiff was in fact referred through the Collegial Review process for a surgical consultation, which was scheduled for August 28, 2017. At that appointment, the consulting surgeon, Dr. Katz, evaluated a separate medical condition, a perianal fistula. However, Dr. Katz also evaluated Plaintiff's hernia, documenting that it could be manually reduced with some difficulty; that Plaintiff had been living with the increasingly symptomatic umbilical hernia for 6-9 years; that Plaintiff's skin was shiny, skewed to left; that Plaintiff's abdominal exam was otherwise not abnormal. (Doc. 26-1 at 1-2, PageID 317-318). According to Plaintiff, Dr. Katz asked him if he would like to have his hernia surgically repaired along with the perianal fistula, to which Plaintiff responded affirmatively. (Doc. 31-1 at ¶¶6-7). Dr. Katz's note reflects a surgical plan to repair both Plaintiff's umbilical hernia and his perianal fistula, but that the scheduling could be done on two separate occasions, depending on how the Ohio State University's ("OSU") Department of Surgery scheduled it. (Doc. 26-1 at 1-2, PageID 317-318; *see also* Doc.31-1 at ¶¶6-7). Thus, as of August 28, 2017, OSU's Department of Surgery was in the process of scheduling the two recommended surgeries.

Soon after his return from the surgical consultation, on September 1, 2017, Plaintiff states that Defendant Conley told him "Hell no, I don't care what Dr. Katz told you, ODRC will not pay for your hernia surgery." (Doc. 31-1 at ¶10). Plaintiff attests that Defendant

3

sent him back to OSU on an unspecified date "for a second opinion from a different doctor who said I didn't need surgery." (*Id*. at ¶11).[3] Plaintiff has failed to provide any citation to the alleged second opinion. Regardless of Defendant's comments, it is undisputed that Defendant Conley can neither schedule nor deny elective surgeries for SOCF inmates. Although neither the fistula nor the hernia surgeries had been scheduled as of the date in issue, October 30, 2017, there is no evidence that Conley or anyone else at SOCF ever directed OSU not to schedule a recommended surgery.[4] (*See* Doc. 24-1 at ¶9, stating that "OSU was in the process of scheduling elective surgical repair of the umbilical hernia and perianal fistula.").

On the afternoon of October 30, 2017 around 2:15 p.m., Plaintiff began experiencing sharp pain from his hernia and called for assistance. Plaintiff was transported to the infirmary for examination. (Doc. 24-4 at 81, PageID 267). An intake note authored by RN Janie Sharp states that Plaintiff arrived at the infirmary in a wheelchair, was fully oriented with respiration unlabored, but was crying. No redness or warmth was noted at his hernia site but the site was painful to touch, and Plaintiff reported his pain level at a "10." (Doc. 24-4 at 85, PageID 271; *see also* Doc. 24-4 at 88, PageID 274, noting protruding hernia without warmth or redness, painful to touch but no nausea).

Defendant examined Plaintiff at approximately 2:46 p.m. (Doc. 24-1 at ¶7). After a brief exam, Defendant confirmed that Plaintiff's symptoms were attributable to his longstanding and still reducible umbilical hernia. (Doc. 24-4 at 83, PageID 269). Defendant's contemporaneous notes reflect "no acute distress" with normal gait and full

---

[3]Defendant does not deny making the comment.
[4]On September 13, 2021, a colorectal surgeon examined Plaintiff and indicated that he would proceed with the planned fistulotomy. (*See* Doc. 24-1 At ¶9). The surgeon's note made no mention of the umbilical hernia at that time.

range of motion.  The gastrointestinal exam reflects "no guarding, soft, non-tender/non-distended, bowel sounds present, umbilical hernia reducible, Pt used abd muscles during hernia physical exam."  (*Id.*)  Defendant's assessment was "Malingering" and states:

> Pt Hx not credible and is inconsistent throughout Hx and exam.  Diet and exercise reviewed with patient.  Pt teaching on notifying medical if any changes.  Pt teaching on findings, outcomes and plan.  Denies any concerns.  Admit to infirmary.  Will continue to monitor.

(*Id.*)  Defendant has submitted a Declaration that, consistent with contemporaneous notes, states that he found Plaintiff during his examination on October 30 to be "suffering from a reducible umbilical hernia for which he had a six-year history."  (Doc. 24-5 at ¶4).

Plaintiff disputes the adequacy of Defendant's examination as well as Defendant's diagnosis of the hernia as still reducible on October 30.  According to Plaintiff, Defendant began his exam by pressing on the hernia "which caused me to wrench and pull away from the excruciating pain."  (Doc. 31-1 at ¶18).  Observing Plaintiff withdraw, Defendant allegedly stated: "I don't have time for this, I'm outta here.  I have a Halloween  party to take my wife to." (*Id.*)   Plaintiff attests that he "begged Conley to examine me and made clear that I wasn't refusing medical treatment by pulling away.   Conley did not acknowledge what I said and left."  (*Id.* at ¶19).

Defendant ordered Plaintiff to be monitored overnight in the infirmary rather than returning him to his cell, but thereafter ended his shift and departed.  (Doc. 24-4 at 84, PageID 270).[5]   The "call orders" that Defendant left directed staff to contact him if Plaintiff exhibited any "[c]hange in status," such as "Temp greater than 101.5 [or] Drop in blood

---

[5]Plaintiff attests that an unidentified inmate porter overheard Defendant state upon his departure: "Don't worry about inmate Coverdale.  He's just trying to get pain medicine."  (Doc. 31-1 at ¶21).  The referenced statement should not be considered because it is rank hearsay.  However, to the extent it is considered by any reviewing court, it is consistent with the Defendant's contemporaneous note that he believed Plaintiff's hernia was still reducible and that Plaintiff was "malingering."

pressure." (Doc. 24-4 at 86-87, PageID 272-73). Defendant prescribed 650 mg Tylenol for Plaintiff's pain and Plaintiff was frequently monitored throughout the night. (Doc. 24-4 at 82, PageID 268; Doc. 24-6 at 3, PageID 306). For example, a medical record dated 10/30/2017 time-stamped 3:57:30 p.m. by RN Stacy Rayburn states:

> Pt states & quot; I need to see the Dr. now & quot; per speaker box, advised ALP [Advanced Level Practitioner] gone for the day and offered assistance, pt became agitated and loud yelling & quot; stupd mother fuckers & quot; Advised pt that his behavior was inappropriate and would not be tolerated. Pt stated & quot; He put me up here to die & quot; Pt was ask again of his complaint/need and he continued to be loud with this nurse and started banging on the wall. Advised pt that PRN Tylenol was given per Nurse Sharp for pain/discomfort as ordered per ALP. Pt verbalized understanding at this time.

(Doc. 24-4 at 89, PageID 275).[6] A chart note by RN Sharp reflects a similar assessment. (Doc. 24-4 at 93, PageID 279) (noting Plaintiff's hernia, complaints of "10" level pain but no warmth or redness, with abdomen around hernia soft and pale pink in color). Additional assessments by Nurses Sharp, Rayburn, and Larissa MacDonald throughout the evening reflect that Plaintiff showed no signs of distress, with respirations easy and unlabored. (*See* Doc. 24-4 at 94, PageID 280; *see also*, *generally*, Doc. 24-4 at 93-96, PageID 279-282).

In his account, Plaintiff attests that "[a]t approximately 9:30 PM on October 30, 2017, I felt something inside my abdomen explode, which sent excruciating pain throughout my entire body." (Doc. 31-1 at ¶23). Notably, the lone defendant in this case – Nurse Practitioner Conley - departed more than five hours before Plaintiff alleges he experienced an increase in pain. No records document either any change in Plaintiff's

---

[6]The referenced ALP was Defendant Conley. (See Doc. 24-5 at ¶¶2-3).

status or notification to Defendant of a change in status prior to the morning of October 31, 2017.

In the early morning hours of October 31, 2017, chart notes by RN Brandon Lindamood reflect that Plaintiff appeared to be sleeping, with his chest rising and falling symmetrically and no complaints voiced. (Page 24-4 at 95, PageID 281). At 7:46 a.m., Nurse Lindamood documented that Plaintiff, then awake, refused his morning Tylenol or a full assessment of his vitals, waving off staff and stating "I am done talking." (*Id.* at 96, PageID 282).

Twenty-three minutes later at 8:09 a.m., Plaintiff was examined. For the first time in the contemporaneous medical records, records indicate that Plaintiff's hernia was no longer reducible. The examination record states that Plaintiff was in no acute distress with "normal bowel[] sounds, no guarding, no bruit, no masses palpated, no tenderness, Umbilical hernia, mild tenderness with palpation, irreducible hernia, 8 cm in dia[meter]." (Doc. 24-4 at 98, PageID 284). Defendant's contemporaneous exam notes confirm that Plaintiff's hernia was reducible prior to the morning of October 31, 2017. (*See* Doc. 24-4 at 97, PageID 283: "pt with history of hernia, c/o intense pain 10/30/2017 but hernia was reducable [sic]. Hernia is non-reducable [sic] today." The same record documents an inconsistency between Plaintiff's report that he had experienced vomiting and sleeplessness overnight and chart notes that he had been observed to be asleep without distress. Based upon the change in status of Plaintiff's hernia, Defendant conferred with the State Medical Director for the Ohio Department of Rehabilitation and Correction ("ODRC"), Andrew Eddy, M.D., and determined that Plaintiff should be transferred to OSU for emergency surgical consultation. (Doc. 24-1 at ¶8). Prior to sending Plaintiff to OSU,

Defendant prescribed an additional pain medication, Toradol. Plaintiff was then transported to OSU by van. (Doc 24-4 at 82, PageID 268; *see also* Doc. 24-4 at 97, PageID 283).

Following his arrival at the OSU Medical Center, emergency surgery was performed by Dr. Daniel Eiferman to repair Plaintiff's hernia, with consultation with Dr. Katz. (Doc. 24-4 at 21 and 23, PageID 207 and 209). Post-surgery, Plaintiff experienced complications, eventually requiring additional treatment for a perforated bowel and a temporary colostomy, as well as multiple recurring hernias.

### III.    Analysis

Section 1983 permits recovery for the deprivation of "any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law, including prison officials such as the Defendant herein. 42 U.S.C. §1983. It is well-established that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain...proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). Deliberate indifference exists when a defendant knows of and then disregards a substantial risk of serious harm to a plaintiff's health and safety. *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 835, 835-37 (1994)). For example, a prisoner who is allowed to suffer needlessly through a denial of medical care when relief is available has a cause of action under the Eighth Amendment against an individual whose deliberate indifference caused the suffering. *Id.*

However, courts generally distinguish between cases involving a complete denial of medical care and cases in which some medical assistance has been administered. In

order to state a claim in the latter cases, the treatment that was provided must be so "woefully inadequate as to amount to no treatment at all" in order to give rise to a cause of action under § 1983. *Westlake v. Lucas*, 537 F.2d 857, 860-61 n.5 (6th Cir. 1976). By contrast, allegations of mere negligence in diagnosis or treatment are not actionable under § 1983. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*

Many inmates disagree with the medical care that is provided to them during their incarceration. Cases involving the non-surgical treatment of hernias in penal institutions, in particular, are fairly common. *See e.g.*, *McCallum v. Mich. Dept. of Corrections*, 2018 WL 4203401 (6th Cir. May 24, 2018) (affirming summary judgment where inmate did not provide evidence to refute the medical evidence that the conservative hernia treatment he received was within the standard of care); *Winslow v. Prison Health Servs.*, 406 Fed. Appx. 671 (3rd Cir. 2011) (prison doctors did not act with deliberate indifference by deciding to forego surgical treatment of hernia); *Palazon v. Sec'y for Dept. of Corrections*, 361 Fed. Appx. 88, 89-90 (11th Cir. 2010) (same). While courts must be careful to review the medical evidence presented in each case, more than one court has suggested that "a physician's decision to treat a prisoner's hernia, including the decision to perform corrective surgery, is a matter of medical judgment which does not give rise to a federal constitutional violation." *Bradley v. Hallsworth*, 2011 WL 4404116, at *8 (W.D. Mich. Aug. 19, 2011); *see also Day v. Lantz*, 360 Fed. Appx. 237, 237-39 (2nd Cir. 2010) (holding that disagreement over the proper treatment for inguinal hernia did not give rise to a constitutional claim).

Plaintiff initially alleged in this case that his post-surgical complications were "caused by Nurse Practitioner Conley's deliberate delay" in failing to send him to OSU on the afternoon of October 30.[7] However, on summary judgment, Plaintiff admits that the undisputed medical evidence shows that his complications were unrelated to any delay in the surgical treatment of his hernia on October 30. (Doc. 31 at 1). Thus, the only remaining issue is whether Defendant acted with deliberate indifference to Plaintiff's pain when he left him in the infirmary overnight on October 30, 2017, prior to transferring him to OSU for a surgical consultation approximately 18 hours later. Because no reasonable juror could find that Defendant acted with deliberate indifference on the record presented, Defendant is entitled to judgment as a matter of law.

There is no dispute that for at least 6 years leading up to the afternoon of October 30, 2017, Plaintiff's hernia remained reducible. According to Plaintiff's own surgeon, during the period of time in which his hernia was reducible, it was "not a surgical emergency." (Doc. 24-1 at 1, PageID 306). By contrast, an irreducible hernia, also known as an incarcerated hernia,[8] often requires urgent attention. Because Plaintiff's hernia had become more symptomatic over the years and - by the time of a surgical consulting exam conducted on August 28, 2017 - had grown to the point that it was difficult to reduce, a surgeon had recommended surgical repair of the hernia as well as repair of Plaintiff's perianal fistula. Notwithstanding that recommendation, Plaintiff has provided no evidence

---

[7] *See* Complaint at ¶ 34.

[8] Plaintiff argues, without citation to the record, that his hernia also "had become strangulated." (Doc. 31 at 2). It is not clear from the post-operative notes that Plaintiff's irreducible or incarcerated hernia on 10/31/17 had become strangulated, although there is a suggestion in the record that a later hernia may have become strangulated. (*See* Doc. 24-4 at 21, PageID 207). While an incarcerated hernia may lead to the more serious condition of a "strangulated" hernia, the terms are distinct and not synonymous. *See* https://www.ncbi.nlm.nih.gov/books/NBK555972/ (accessed on 10/21/21) ("If the contents of the hernia are not able to be reduced, the hernia is considered incarcerated. A strangulated hernia occurs when the hernia contents are ischemic due to a compromised blood supply.").

that his reducible hernia required more immediate surgical treatment at any point in time prior to October 31, 2017.

At the August 28, 2017 surgical consultation, the hernia remained reducible, albeit "with difficulty." (Doc. 26-1 at 1, PageID 317). Plaintiff alleges that the Defendant either knew or should have known that Plaintiff's hernia had become irreducible on the afternoon of October 30, but deliberately chose to delay transferring Plaintiff to OSU for surgical treatment until the morning of October 31, 2017. Plaintiff maintains that Defendant's deliberate indifference and misdiagnosis caused him to suffer from excruciating pain for approximately 18 hours longer than he would have if Defendant had directed Plaintiff's immediate transfer to OSU.[9]

Plaintiff attests that throughout those 18 hours, he "laid in the infirmary cell in agony… without any medical treatment or pain medicine." (Doc. 31-1 at ¶22). He further states that he "screamed all night for help but was ignored." (*Id*. at ¶ 24). However, contemporaneous chart notes by multiple SOCF nurses refute this subjective and self-serving account. "When self-serving testimony is blatantly and demonstrably false, it understandably may not create a genuine issue of material fact, thereby allowing a court to grant summary judgment." *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).[10]

---

[9]Plaintiff's theory of recovery assumes that he would have been operated upon immediately upon his arrival at OSU in the late afternoon of October 30, 2017. Even for persons who are not incarcerated, there may be a delay between a surgical consultation and surgery. Because there is no evidence that Defendant violated the Eighth Amendment in this case, the Court need not further examine this issue.

[10]Plaintiff cites to *West v. Lagado*, 2021 WL 2311934 (E.D. Mich. June 7, 2021) to support his argument that whether a plaintiff "has provided credible testimony is a question of fact that a jury, not the court, must resolve." However, in *Lagado* the central issue was whether a reasonable jury might credit the plaintiff's deposition testimony that he reported his stomach pain to the defendant who ignored him over defendant's testimony that – while he did not recall plaintiff – he would not have ignored a request for medical attention. Thus, the critical issue had little to do with records and everything to do with the credibility of the two parties.

In addition, in contrast to Plaintiff's lay opinion that his hernia became irreducible on October 30, Defendant has offered multiple records that reflect that the hernia remained reducible on the afternoon of October 30 and did not become irreducible until the morning of October 31, 2017, at which point Defendant directed Plaintiff to be immediately transferred to OSU for a surgical consultation.  In addition to the records, Defendant offers the opinions of two physicians who examined the records in this case. The first opinion is by Dr. Eddy, the ODRC Medical Director,  who determined that until Plaintiff's umbilical hernia was found to be irreducible on October 31, it mandated nothing more than conservative treatment. (Doc. 24-1).  Based upon the medical records, Dr. Eddy attests that housing Plaintiff in the infirmary on the night of October 30, 2017 was in accordance with the standard of care.  Dr. Daniel Eiferman, Plaintiff's treating surgeon at OSU, concurs with Dr. Eddy's conclusions, including that: (1) medical documentation reflected that the hernia was reducible when Defendant examined Plaintiff on October 30 and remained reducible until the morning of October 31; (2) it was medically appropriate and within the standard of care for Plaintiff to remain in the SOCF infirmary for monitoring and observation on October 30; (3) it was not medically necessary for Plaintiff to be transferred to OSU for a hernia medical consult until Defendant discovered that the hernia was no longer reducible on the morning of October 31, 2017. (Doc. 24-6 at 5-6, PageID 308-309).

Plaintiff admits he has no medical evidence to support his opinion that the hernia became irreducible on October 30, 2017.  His only evidence is his subjective belief that it was so.  He attests that he "know[s] the difference between a reducible and irreducible hernia because I had lived with a hernia for years and knew how to push it back in my

abdomen when it bulged out," and "could not press my hernia back in place on the afternoon of October 30, 2017." (Doc. 31-1 at ¶28).

In some cases, a prisoner's need for medical care is so obvious to even a lay person that a defendant's failure to render any care can support constitutional liability. *See Blackmore v. Kalamazoo County*, 390 F. 3d 890, 899 (6th Cir. 2004) (reversing summary judgment where jailers failed to request medical assistance for more than 2 days despite plaintiff's obvious manifestations of pain and injury that included classic signs of appendicitis including sharp and severe stomach pain and vomiting). In contrast to the facts of *Blackmore*, in this case Plaintiff was taken to the infirmary for a medical assessment as soon as he complained of an increase in hernia pain on October 30, 2017. The assessment of whether the longstanding hernia was still reducible on October 30 was a question of medical judgment and not something "obvious to a lay person." Underscoring this fact, Plaintiff reported during his surgical consultation two months earlier that he could no longer reduce his hernia. (Doc. 26-1 at 1). Notwithstanding Plaintiff's subjective report that he could not reduce the hernia, the examining surgeon's objective exam on that date revealed that the hernia "can be manually reduced with some difficulty." (*Id.*)

In short, in the absence of any corroborative medical evidence to the contrary, Plaintiff's lay opinion that his hernia had become irreducible the day before Defendant diagnosed it as such is not sufficient to overcome the overwhelming medical evidence that his hernia remained reducible on the afternoon of October 30, 2017. *See generally, Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (holding that "verifying medical evidence" is required to establish a detrimental effect when a claim is based upon

13

a delay in medical treatment for a non-obvious condition). Based upon Defendant's unrefuted evidence, Plaintiff's medical condition on October 30, 2017 did not require his immediate transfer to OSU for further surgical evaluation.[11]

In the absence of any corroborative medical evidence of his own, Plaintiff challenges the veracity of Defendant's records, suggesting that Defendant "had a motive to make a false entry in [Plaintiff's] medical records." (Doc. 31 at 8). He implies that Defendant truncated the exam after Plaintiff involuntarily pulled away when Defendant pressed on the hernia because Defendant wanted to attend a Halloween party. Defendant does not deny making the "Halloween party" comment. However, an insensitive or unprofessional remark does not mean that Defendant provided a false diagnosis and directed numerous nurses to do so throughout the night. Pressing down on the hernia is understood to be a primary method of assessing whether a hernia is reducible. Given Plaintiff's admission that Defendant performed that examination step and the Defendant's contemporaneous medical opinion that the hernia remained reducible and that Plaintiff was "malingering," the insensitive remark is not sufficient to create a genuine issue of material fact about whether Defendant falsified his diagnosis.

Last, ample case law supports the grant of judgment to the Defendant on the record presented. For example, in *McCallum v. Michigan Department of Corrections*, 2018 WL 4203401, at *3, an inmate sued a healthcare contractor who declined to recommend surgical repair of the plaintiff's hernia until it became apparent that the hernia

---

[11]Arguably, even if Plaintiff had some medical evidence in his favor, Defendant would still be entitled to judgment because a difference in medical opinions is insufficient to prove a constitutional claim. *See Bazzetta v. Hallworth*, 2015 WL 5022288, at *9 (W.D. Mich. Aug. 24, 2015) (a disagreement between medical providers as to whether plaintiff required surgical repair of his hernia did not amount to deliberate indifference, because plaintiff did not demonstrate that decision denying surgery was based on something other than doctor's medical judgment).

14

both affected the inmate's ability to walk *and* was non-reducible, in accordance with the institution's standards for the surgical repair of hernias.  *Id.* at *3.  The plaintiff complained that the delay in the surgical repair of his hernia violated the Eighth Amendment.  The Sixth Circuit affirmed the grant of summary judgment based upon the unrefuted medical evidence provided.

> Where a prisoner alleges only that his medical care was inadequate, the federal courts generally are reluctant to second-guess medical judgments, *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011), and a disagreement over the wisdom or correctness of a medical judgment is not sufficient for the purpose of a deliberate-indifference claim.

*Id.* at *3 (additional internal citations omitted, holding that "so long as McCallum's hernia remained reducible, surgery was not necessary."). !!!

As in *McCallum*, the essence of Plaintiff's claim is his disagreement with Defendant's medical judgment.  Because Plaintiff has no evidence that his hernia was objectively irreducible on October 30, much less that Defendant subjectively knew or should have known that fact when he examined him on that date, Defendant is entitled to judgment as a matter of law.  *Accord Morris v. Johnson*, 2019 WL 2360886, at *6 (N.D. Fla. May 3, 2019) (granting judgment to defendants where plaintiff's medical records did not indicate that his hernia required surgery on any earlier date); *Adams v. Tangilag*, 2018 WL 1041565, at *4 (W.D. Ky. Feb. 23, 2018) ("Simply because Defendants initially treated his hernia conservatively rather than with surgery is merely a disagreement with the treatment he received rather than a lack of treatment."); *see also*, *generally*, *Barbour v. Allen*, 2020 WL 877813, at *5 (W.D. Ky. Feb. 21, 2020) (granting summary judgment even though prison doctor did not refer Plaintiff for hernia surgery as had an emergency room physician, where evidence showed that doctor was attentive to plaintiff's condition,

monitored his hernia during the time he was incarcerated, and provided treatment); *Shead v. Purkett*, 2009 WL 5220155, at *4 (E.D. Mo. Dec. 31, 2009) (granting summary judgment where plaintiff complained of delay in surgery for non-reducible hernia, but did not identify any detrimental effects of the alleged delay beyond discomfort, for which he was provided analgesic pain medication); *Little v. D'Amico*, 2007 WL 295365, at *5 (D. Nev. Jan. 25, 2007) (granting summary judgment in part because plaintiff did not allege he suffered any injury from delay in hernia surgery); *Davis v. First Correctional Medical*, 589 F.Supp.2d 464, 470 (D.Del. 2008) (delay in repair of hernia that became irreducible over time did not constitute deliberate indifference).

Defendant also argues that he is entitled to qualified immunity, which protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because Defendant did not exhibit deliberate indifference to Plaintiff or otherwise violate the Eighth Amendment in this case, Defendant is entitled to qualified immunity.

## IV. Conclusion

For the reasons stated, it is herein **RECOMMENDED** that Defendant's Motion for summary judgment (Doc. 24) be **GRANTED**, and that this case be dismissed.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**United States District Court**
**Southern District of Ohio**
**Western Division**

THOMAS A. COVERDALE,

    Plaintiff,

    v.

DAVID C. CONLEY,

    Defendant.

Case No: 1:19-cv-920

McFarland, J.
Bowman, M.J.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within FOURTEEN (14) DAYS of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within FOURTEEN (14) DAYS after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  See *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

17